# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KELLEY DONLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 15 C 5586 |
| | ) | |
| STRYKER CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Now before the Court is Defendant Stryker Sales Corporation's ("Stryker"), incorrectly named Stryker Corporation in the caption of the Complaint, Motion for Summary Judgment against Plaintiff Kelley Donley ("Donley"), pursuant to Federal Rule of Civil Procedure 56.  For the following reasons, the Motion is granted.

## BACKGROUND

The following facts taken from the record are undisputed, except where otherwise noted.  The parties disagree regarding the event that led to Donley's termination.  Stryker argues that it "terminated Donley's employment . . . after it came to light that she had taken [photos] of the CEO of one of Stryker's valued vendors [(the 'CEO')] in a highly intoxicated state in the CEO's private hotel room and then shared" them with coworkers.  Conversely, Donley "claims that Stryker terminated

her employment in violation of Title VII because she . . . reported to Human Resources alleged [sexual] harassment of" another employee.

Donley began working for Stryker, a medical technology company, in October 2010, after it acquired Gaymar Industries, which was Donley's previous employer. She worked from home, covering Stryker's Central and Midwest territories. While employed at Stryker, Donley attended a clinical team meeting in Vail, Colorado, which took place from May 21, 2014 through May 23, 2014. The CEO also attended the meeting in Vail. Throughout this time period, attendees stayed overnight at the same "hotel where the meetings were taking place."

During one of the nights in Vail, attendees got dinner in groups, and after dinner, they "returned to the hotel bar." Throughout "the evening, Donley and others," including the CEO, consumed alcohol. Because the CEO was slurring her words, and Donley "didn't want to see anything adverse happen," Donley testified that "she escorted the . . . CEO up to her hotel room." At her hotel room, the "CEO washed her face and changed into her [long-sleeved flannel] pajamas" with Donley present.

While in the CEO's hotel room, Donley took a photo of the CEO "with her Stryker-issued cell phone." In response to this photo, the CEO stated, "oh, no, no, more pictures." Donley testified that she then responded, "are you kidding, on a good day where I work hard at it, I don't look half this cute." Donley also showed the CEO the photo. According to Donley, after seeing the photo, the CEO responded, "oh, I do

look cute, don't I[?]" Donley subsequently took another photo. In the second photo, the "CEO blinked such that 'it might have looked like she was sleeping.'" Prior to leaving the CEO's hotel room, Donley "put a garbage can . . . by the bed in case she got sick in the middle of the night." Donley then returned to the hotel bar.

While at the hotel bar, Donley claims that she showed Jeff Thompson ("Thompson"), the Director of Clinical Sales and Donley's supervisor, the second photo of the CEO. Donley alleges that she did this because she wanted to show Thompson that the CEO was okay. To further support her assertion that she showed Thompson the photo on the night that she took it, Donley contends that Stryker stated in a position statement that it "submitted to the EEOC in January of 2015 that [Donley] showed the photos at issue to Thompson on the night she took them."

Stryker disputes that Donley showed Thompson any photos on the night that she took them. First, Thompson testified that Donley did not show him any photos of the CEO upon her return to the hotel bar. Thompson also testified that Donley did not tell him that she took any photos of the CEO. Thompson attested that a coworker on his team first informed him that Donley took photos of the CEO, but he did not remember who that person was. Thompson also stated that after he became aware of the photos, he reported them to Stacie Ferschweiler ("Ferschweiler"), Director of Human Resources, who investigates allegations of misconduct. Second, Stryker argues that Thompson did not review the position statement "before its submission to the EEOC," and asserts that it "simply stated" that during her exit interview, Ashlee

Schexnyder ("Schexnyder") "told . . . Ferschweiler that . . . Schexnyder was not the only person to whom [Donley] showed [a] video and the photographs . . . . [Donley] also showed the photos and video to . . . Thompson," who similarly to Schexnyder, "was unamused and advised [Donley] that she should delete the photos and video."

Donley admits that, while she was at the hotel bar, "some of her coworkers asked for photos [that she] had taken earlier in the evening, so she gave them her phone[,] and she thinks they swiped through the photos on her phone." Donley testified that "nobody" said "a single word" to her about the photos of the CEO.

Donley claims that Stryker terminated her not because of the events that took place in Vail, but in violation of Title VII because on or around June 27, 2014, "she made a formal complaint of sexual harassment to" Ferschweiler. Donley informed Ferschweiler that Stryker's Midwest Regional Manager "behaved inappropriately toward a female Sales Representative during . . . Stryker's Midwest Regional Meeting" in early June 2014 at the Manager's cabin, "at which Donley had not been present." Purportedly, the Manager was touching the Representative's leg, "making inappropriate comments about her," and the night before the meeting, he invited her to his cabin alone.

Ferschweiler forwarded Donley's internal complaint to Melissa Lewis ("Lewis"), Senior Director of Human Resources. "Shortly thereafter, Lewis contacted Donley." Lewis "was very supportive, telling Donley that she appreciated Donley bringing the situation to her and Ferschweiler's attention." Lewis also emailed

Donley to thank her for her time. Lewis advised Donley that "it was a highly confidential matter," and informed Donley that she "should not hesitate to reach out to her should she have any questions or additional information." According to Donley, "Human Resources seemed to take the investigation seriously," and Lewis demonstrated empathy. Donley admits that she did not receive "any negative comments" regarding her "report against the . . . Manager, and that no one in management ever made any statements to her that would indicate they had a problem with" her internal complaint against the Manager.

Human Resources investigated Donley's internal complaint, interviewing multiple individuals, including the Representative and the Manager. "As a result of the investigation," Stryker decided to terminate the Manager's employment on or around July 31, 2014. At the time of his termination, Stryker offered the Manager a severance agreement in the amount of $29,817.00. Stryker claims that it offered the Manager the severance agreement "in exchange for strengthening the non-compete agreement that" he signed with Stryker in 2006 because, as the Manager, he "was aware of and had access to a large amount of proprietary information." Donley, in contrast, alleges that "[t]he severance agreement d[id] not strengthen the non-compete." According to Donley, it "merely attached a copy of the previously signed non-compete, required the . . . [Manager] to 'acknowledge[ ] and affirm[ ] the obligations set forth' therein, and stated that the severance compensation was 'additional consideration for post-termination obligations.'" Donley argues that she

too "signed a Stryker Confidentiality, Intellectual Property, Non-Competition, and Non-Solicitation Agreement in March of 2011." Donley also claims that she "was aware of and had access to a large amount of [Stryker's] proprietary information." Nonetheless, Stryker did not offer Donley a severance agreement upon her termination.

The parties dispute when Ferschweiler *first* became aware of the events that took place in Vail. Stryker claims that it learned about the events in Vail around August 1, 2014, during Schexnyder's exit interview. As was her standard practice, on "August 1, 2014, Ferschweiler conducted an [exit] interview of" Schexnyder, who was one of Donley's clinical team coworkers. During the exit interview, Schexnyder "stated that Donley had helped the CEO . . . to bed" in Vail, "after the CEO had had some alcoholic drinks, and when Donley returned to the hotel bar . . . , Donley had a video that she had taken of the CEO passed out on her bed with a trashcan beside the bed." Schexnyder "also told Ferschweiler that Donley had taken photos of the CEO, and that [she] thought that Donley had shown [them] to clinical team members Tracy Wise [('Wise')] and Chanda Wiedrick [('Wiedrick')]." After Schexnyder's exit interview, "Ferschweiler initiated a disciplinary investigation" to determine whether Donley "had taken compromising photos or videos" of the CEO.

"Donley admits that she does not know how the photos came to Human Resources' attention." However, Donley alleges that "Thompson testified that he learned of the photos" before Ferschweiler began the formal investigation, reported

them to her, and "asked her to investigate" them. Although "Thompson could not recall specifically when he reported the photos to" Ferschweiler, according to Donley, "he testified that [their] conversation was separate from the interviews he had with" Ferschweiler during the formal investigation.

As part of the formal investigation, on Monday, August 4, 2014, "Ferschweiler interviewed Wise," who told her "that Donley had taken video and photos of the . . . CEO in her room passed out on her bed with a trashcan next to her." Wise informed Ferschweiler that Donley showed the photos to Thompson. That same day, "Ferschweiler interviewed Wiedrick, who said that she" personally did not see "any photos or videos of" the CEO, but that Schexnyder told her "that Donley had videotaped the CEO passed out." Ferschweiler interviewed Donley on August 6, 2014. During this interview, "Donley admitted to taking photos of the . . . CEO." Donley denied that these photos were "compromising." Donley also denied that she took any "compromising videos." Donley "told Ferschweiler that she . . . deleted the photos" "to free up additional space on her phone." "There is no evidence that she printed or sent them to anyone prior to deleting them."

The investigation revealed that Donley took "images of the . . . CEO while she was intoxicated, . . . in violation of Stryker policies." Ferschweiler shared the results of the investigation with Thompson. Ferschweiler also "informed Senior Director of Patient Care Sales[,] Chad Rohrer [('Rohrer'),] of the outcome of the investigation,

that in-house counsel had been consulted, and that the decision was made to terminate Donley."

While Stryker maintains that Thompson was the sole decisionmaker with respect to Donley's termination, Donley contends that Ferschweiler and Thompson both acted as decisionmakers. "At the time of Donley's termination," however, "Thompson did not have any knowledge" of Donley's internal complaint or Stryker's later investigation of the Manager's conduct. Moreover, "no one had shared with Thompson" the reason for Stryker's termination of the Manager.

"Thompson and Ferschweiler informed Donley of her termination on August 18, 2014." Ferschweiler drafted Donley's termination letter. "Thompson reviewed and agreed with its contents." Donley's termination letter opened with a statement that Stryker decided to terminate her employment "as a result of [her] inappropriate conduct and poor judgment [that she] exhibited during the clinical team meeting in Vail." The termination letter noted that her behavior violated Corporate Policies One, The Code of Conduct Policy; Four, The Drug-Free Workplace/Prohibited Substances Policy; and Seven, The Electronic and Other Business Systems Policy.

During his deposition, "Thompson testified that he could not recall how [Donley's] conduct" "violated the cited policies," while maintaining that his "role is not to look at the exact policy numbers," and "the fact that there's inappropriate images of a CEO of a company that [he does] business with continually and will continue to do is" unacceptable. Similarly, in her deposition, Ferschweiler recognized

that Policy Four targets those who use alcohol in the workplace, "acknowledged that many Stryker employees were drinking on the" relevant night, stated that she did not know whether Donley was intoxicated, and maintained that "it was not the mere fact that [Donley] was drinking at the conference [that] resulted in a violation" of Policy Four.  Ferschweiler testified that Policy Four "relate[s] to a safe work environment as well as endangering the reputation of Stryker in the community," and that Donley violated Policy Four by taking "photos and videos of [the CEO] in a compromising state and then show[ing] them . . . to employees in a hotel bar."  This, according to Ferschweiler, is "not conduct that is becoming of an employee, and" it creates an environment to which Stryker would not subject its employees or its vendors.  Ferschweiler stated that taking the photos and "treat[ing] another person who was attending a Stryker meeting in that manner is very damaging to Stryker."  Ferschweiler concluded "that the decision [that Donley] made, whether under the influence [of alcohol] or not, . . . create[d] an unsafe work environment for" the CEO.

Ferschweiler further "testified that [Donley] used a Stryker-provided device to take inappropriate photographs and showed" them to other employees, in violation of Policy Seven.  Ferschweiler "acknowledged that [Donley] did not access anyone's personal files or communications without permission," because Policy Seven prohibits "employees from accessing or attempting to access documents, files, communications, and recordings created on, by, or through electronic systems by another employee without permission."  But "Ferschweiler asserted that [Donley neverthless] violated"

Policy Seven "by taking the [CEO's] photo without her 'permission,'" stating that the CEO "was not in the position to give permission to have those photos and videos taken and then show[n] to other employees."

On June 23, 2015, Donley filed a one-count Complaint, alleging retaliation in violation of Title VII of the Civil Rights Act of 1964. On August 9, 2016, Stryker filed a Motion for Summary Judgment against Donley, asserting "that there is no genuine issue as to any material fact and Stryker is entitled to judgment as a matter of law" because "the undisputed material facts demonstrate that [Donley] was terminated for engaging in unacceptable and inappropriate behavior toward the CEO." We agree.

## LEGAL STANDARD

### I.  Summary Judgment

A motion for summary judgment requires the Court to construe all facts and to draw all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact arises where a reasonable jury could find, based on the evidence of record, in favor of the non-movant. *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court considers the whole record. *See id.* at 255–56.

Northern District of Illinois Local Rule 56.1 requires the "party moving for summary judgment to include with that motion 'a statement of material facts as to

which the moving party contends there is no genuine issue and that entitle the moving party to a judgement as a matter of law.'" *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (quoting N.D. Ill. R. 56.1(a)(3)). "The movant bears the initial burden of showing that no genuine issue of material fact exists." *Genova v. Kellogg*, 12 C 3105, 2015 WL 3930351, at *3 (N.D. Ill. June 25, 2015). "The burden then shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the movant bears the burden of proof at trial." *Id.* The non-moving party must respond to the movant's Local Rule 56.1(a)(3) statement and may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits. N.D. Ill. R. 56.1(b); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-movant must support her contentions with documentary evidence of specific facts that demonstrate that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

## II.    Title VII Retaliation Claims

"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2521 (2013). In *Ortiz v. Werner Enterprises, Incorporated*, the Seventh Circuit, clearly frustrated with the "[t]he use of disparate methods and the search for elusive mosaics," substituted "the notion of two distinct methods of proof" of retaliation—"the 'direct' and 'indirect'—with a more straight-forward inquiry." 834 F.3d 760, 764 (7th Cir. 2016); *Harris v. Office of the Chief Judge of the Circuit*

*Court of Cook County, et al.*, No. 16-1783, 2016 WL 7228703, at *2 (7th Cir. 2016) (citation omitted); *see Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008) (describing the direct and indirect methods of proving retaliation under Title VII); *Henderson v. McDonald*, No. 15 C 4445, 2016 WL 7231606, at *2 (N.D. Ill. Dec. 14, 2016).  It held that: "'convincing mosiac' is not a legal test," nor is it "a legal requirement in an employment-discrimination case." *Ortiz*, 834 F.3d at 764–65. Instead, the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765; *see Memon v. W. Tech. Coll.*, No. 16-1814, 2016 WL 7228688, at *2 (7th Cir. 2016).  However, *Ortiz* "does not undermine '[t]he burden-shifting framework created by *McDonnell Douglas*.'"  *Hudson v. Miramed Revenue Grp.*, No. 15 C 4945, 2016 WL 6948374, at *4 (N.D. Ill. Nov. 26, 2016) (citation omitted).  "*McDonnell Douglas* identifies one pattern that the evidence might fit that would enable a reasonable juror to find discrimination," mainly, "evidence showing that the plaintiff belonged to a protected class, met her employer's legitimate expectations, suffered an adverse employment action, and was similarly situated to other employees who were not members of the protected class and who were treated better," if "the defendant fails to articulate a reasonable alternative explanation or the plaintiff shows that the defendant's . . . explanation is a pretext." *Zegarra v. John Crane, Inc.*, No. 15 C 1060, 2016 WL 6432587, at *7 (N.D. Ill. Oct. 31, 2016).  However, "[a] district court

must not limit its analysis to *McDonnell Douglas*," but broadly examine whether "the record contain[s] sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused [one's] discharge." *Id.*; *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). To survive summary judgment, thus, Donley "must present evidence that, considered as a whole, would allow a reasonable juror to conclude that [she] was discriminated against due to a protected characteristic, suffering an adverse employment action." *Hudson*, 2016 WL 6948374, at *5. Donley has failed to meet her burden.

## DISCUSSION

Stryker argues, relying on *McDonnell Douglas*, that it is entitled to judgment as a matter of law because Donley has failed to: (i) "show that she was meeting Stryker's legitimate expectations at the time of her termination;" (ii) "offer any evidence that she was treated less favorably than any similarly situated employee who did not engage in statutorily protected activity;" and (iii) "present evidence that would call into question Stryker's legitimate reason for terminating her employment." Donley claims that Stryker ignores "the myriad issues of fact and reasonable inferences which could easily lead to a verdict" in her favor. We disagree.

The evidence would not lead a reasonable fact finder to conclude that Donley's internal complaint of alleged sexual harassment caused her termination. "The mere existence of a scintilla of evidence in support of" Donley's position is "insufficient; there must be evidence on which the jury could reasonably find for" Donley.

*Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *Dorsey v. Morgan Stanley*, 507 F.3d 624, 628 (7th Cir. 2007) ("[I]nferences . . . based on mere speculation . . . are insufficient to overcome summary judgment.").

The undisputed material facts demonstrate that Stryker terminated Donley's employment because of her own drunken conduct in Vail, Stryker's policies, and its valued relationship with the CEO. In an attempt to survive summary judgment, Donley argues four points, that: (i) it is disputed when Stryker learned of the events that took place in Vail; (ii) the fact that the Manager received a severance agreement at his termination while Donley did not is evidence of retaliation; (iii) the timing of Donley's termination establishes a causal link between her internal complaint and her termination; and (iv) Stryker's inability to clearly explain how Donley's actions in Vail violated its corporate policies demonstrates that its reason for her termination is pretextual. The Court discusses each in turn below.

## I. When Stryker Learned of the Events in Vail

First, Stryker argues that it became aware of Donley's conduct in Vail on August 1, 2014, "between Donley's late June 2014 internal complaint and her mid-August 2014 termination." Thus, according to Stryker, "[t]his intervening event and the outcome of Stryker's subsequent investigation" led to Donley's termination. *See Reid v. Neighborhood Assistance Corp. of Am.*, 749 F.3d 581, 589 (7th Cir. 2014) (affirming summary judgment and stating that "plaintiffs' termination was immediately preceded by an intervening event unrelated to their complaints").

Donley, in contrast, contends that her internal complaint constitutes the "intervening event" that led to her termination. Donley argues that Stryker knew "of the photos at issue well before [Donley] made her internal complaint and months before she was terminated." The Court finds, based on the evidence of record, that when Stryker learned of the photos does not create a dispute of material fact.

First, Donley cites to the position statement that Stryker "submitted to the EEOC in January of 2015." Donley claims that Stryker "admitted in the position statement . . . that [Donley] showed the photos at issue to . . . Thompson on the night she took them." Stryker disputes this, arguing that the position statement merely indicated that, during her exit interview, Schexnyder "told . . . Ferschweiler that . . . [Schexnyder] was not the only person to whom [Donley] showed [a] video and the photographs . . . . [she] also showed [them] to . . . Thompson[, who,] . . . like [others], was unamused and advised [Donley] that she should delete the photos and video." Stryker also contends that Thompson did not read the position statement, and argues that it is both immaterial and inadmissible. *See McCoy v. WGN Cont'l Broad Co.*, 957 F.2d 368, 373–74 (7th Cir. 1992) ("[T]his court is reluctant to give substantial weight to a position taken in adversary proceedings before the Department [of Human Services]. Myriad factors undoubtedly influence the positions taken in such a forum, as opposed to federal court, including the opportunity and incentives for discovery and thorough internal investigation. This court declines to bind ADEA defendants to the positions they initially assert in state administrative proceedings.").

Second, Donley emphasizes the inconsistencies among Stryker's testimony regarding when it learned of the photos. Donley testified "that she showed . . . Thompson the photos" on the night that she took them. During Thompson's deposition, in contrast, he stated that "the first time [that he] learned about [the photos] . . . was from one of [his] team members." Donley also claims that Wise told "Ferschweiler that [Donley] had shown the photos at issue to . . . Thompson on the night she took them." Donley similarly claims that it is disputed when Ferschweiler learned of the photos. "Ferschweiler testified that she first learned of the photos during [Schexnyder's] exit interview on August 1, 2014." But, at his deposition, Thompson testified that he reported the photos to Ferschweiler, although he could not remember exactly when. Thompson did, however, testify that the "conversation was separate from the interviews [that] he had with" Ferschweiler "as part of her formal investigation." Thus, Donley argues that "[t]his inconsistency in [Stryker's] testimony creates a genuine issue of material fact as to whether [Stryker] became aware of [Donley's] alleged misconduct before or after" her internal complaint.

Stryker argues that when it learned of the photos "is immaterial because it ignores the undisputed fact that Thompson had no knowledge at the time of his decision to terminate Donley" of her internal complaint. Thus, Stryker reasons, Thompson "could not possibly have had any retaliatory motive with respect to his decision to terminate Donley." Because of this fact, Donley's argument misses the mark. The exact moment at which Thompson first laid eyes on the photos, if he did,

is not material because it is undisputed that at the moment of the decision to terminate Donley's employment, Thompson had no knowledge of Donley's internal complaint, the Manager's alleged sexual harassment of another employee, or the reasons for his subsequent termination. Thus, Donley's internal complaint simply could not have been Thompson's motivation for her termination. Even assuming that Ferschweiler and Thompson made the decision to terminate Donley's employment together, which Stryker disputes, according to Stryker, in addition to the undisputed fact that Thompson lacked knowledge regarding Donley's internal compliant, Donley has not presented any "evidence that Ferschweiler harbored any retaliatory animus toward Donley." We agree. In fact, Donley conceded that no one "indicated that they had a problem with the fact that she made a complaint." Thus, whether Stryker learned of the photos that Donley took before or after she filed her internal complaint is a distinction without a difference.

## II.    The Manager's Severance Agreement

Next, relying on *McDonnell Douglas*, Stryker argues that Donley "was not meeting Stryker's legitimate expectations at the time of her termination" since it "legitimately expects its employees to act with integrity towards its business partners," which does not include taking photos of an intoxicated CEO of one of Stryker's vendors in her hotel room. *See, e.g.*, *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 376 (7th Cir. 2007) ("[A]n employee's complaint of harassment does not immunize h[er] from being subsequently . . . terminated for workplace behavior.")

(citation omitted). Moreover, Stryker claims that Donley "has not presented any evidence that Stryker retained any other employee who engaged in conduct similar to hers," and she has not "attempted to identify any employee who was alleged treated more favorably than her." Here, Donley presents evidence that, at his termination, Stryker offered the Manager a severance agreement amounting to nearly $30,000, and she was not offered the same.

According to Stryker, the severance agreement was executed "in exchange for strengthening the non-compete agreement that" the Manager "previously signed with Stryker," because he "was aware of and had access to a large amount of proprietary information during his employment with Strkyer." Donley argues that "[t]he severance agreement does not strengthen the non-compete agreement," as "she, too, had signed the same non-compete and also had substantial knowledge of [Stryker's] confidential and proprietary information." Stryker maintains that the Manager and Donley "were not similarly situated," the Manager "occupied a more senior position than Donley," held a different job title, reported to different a superior, and they were terminated for different conduct by different decisionmakers. *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) ("[F]or an individual to be similarly situated to the plaintiff, the plaintiff must show that the individual is 'directly comparable to her in all material respects.'") (citation omitted). Donley has failed to demonstrate that she and the Manager were directly comparable.

## III. Suspicious Timing

Third, Stryker argues that "Donley cannot establish a causal link between her protected activity and her termination." "Even assuming [that the complaint] is temporally proximate," Stryker contends "that mere temporal proximity between protected activity and an adverse employment action is not enough to establish a genuine issue of material fact." Donley, in contrast, claims that "the timing of [Stryker's] decision to terminate [her] is sufficient to establish a causal link." We disagree.

Donley cites *Casna v. City of Loves Park* for the proposition that suspicious timing alone *is* enough to create a triable issue of fact. However, Donley fails to mention that the Court in *Casna* held that before it was an "extreme case." 574 F.3d 420, 427 (7th Cir. 2009) ("[S]uspicious timing is rarely enough to create a triable issue, . . . but in an extreme case like this, where the adverse impact comes 'on the heels' of the protected activity, it is."). *Casna* is different from the instant case, as in *Casna*, "the Chief [of Police] recommended that Loves Park fire [plaintiff] the *very day after* she complained to [the Chief's secretary] about her hostility to [plaintiff's] hearing impairment." *Id.* (emphasis added). Here, at least six weeks passed between Donley's internal complaint of sexual harassment and her termination. The case law is clear: "suspicious timing alone rarely is sufficient to create a triable issue." *See, e.g.*, *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005); *Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 701 (7th Cir. 2014) ("[W]e have repeatedly held that

mere temporal proximity is rarely sufficient."); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) ("'[M]ere temporal proximity' is not enough to establish a genuine issue of material fact.") (citation omitted).

## IV.    Pretext

Finally, Stryker argues that it "had a legitimate, non-retaliatory reason for terminating [Donley's] employment," which was "its determination that she had behaved inappropriately toward the CEO," and Donley "cannot show that this reason was pretextual."  Donley argues that Stryker's "inability to explain how [Donley] violated . . . the policies cited in her termination letter would allow a jury to reasonably infer that [Stryker's] asserted justifications for her termination were false and pretextual."  The Court agrees with Stryker.

According to Donley, during Thompson's deposition, he "could not recall how [Donley's] conduct violated any of the" cited policies.  Thus, Donley argues that since "Thompson was a decision-maker in [Donley's] termination and he signed her termination letter which cited the policies at issue, his inability to explain the nature of [Donley's] policy violations suggests that [Donley] did not actually violate any policy and that [Stryker's] allegation that she did is pretextual."  Not only does this conclusion not logically follow, but it is also unsupported by the evidence.  In his deposition, Thompson stated that his "role is not to look at the exact policy numbers," and "the fact that there's inappropriate images of a CEO of a company that [he does] business with continually and will continue to do is . . . unacceptable."

Donley also contends that Ferschweiler could not "explain how [Donley's] alleged conduct violated" the Substance Abuse Policy, Policy Four, and that Ferschweiler's explanation of how Donley violated the Electronic Systems Policy, Policy Seven, was "confusing." Ferschweiler testified that Policy Four "relate[s] to a safe work environment as well as endangering" Stryker's reputation in the community. She stated that Donley took "photos and videos of [the CEO] in a compromising state and then showed them . . . to employees in a hotel bar," which "is not an environment that [Stryker] would ever subject" its employees or vendors to. Ferschweiler also stated that taking the photos and "treat[ing] another person who was attending a Stryker meeting in that manner is very damaging to Stryker." Finally, Ferschweiler testified that Donley's conduct violated Policy Seven "because she used her Stryker-issued phone to make offensive communications," and the CEO could not "give permission to have those photos taken and" shown to others.

In sum, Donley attempts to demonstrate pretext by arguing that Stryker was unable to pigeonhole her termination into its corporate policies. Relying on immaterial inconsistencies, Donley argues that Stryker "bent over backwards to falsely accuse [her] of violating a number of policies . . . to justify an otherwise unjustified termination." This is unpersuasive. It is not absurd that taking photos of an intoxicated CEO in her hotel room at a work event will not fit neatly into a violation of a corporate policy. Moreover, pretext is "more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony

reason for some action." *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015) (citation omitted). "Stryker has consistently spoken with one voice regarding the reason for Donley's termination: she was terminated because she took inappropriate images of the intoxicated CEO of a valued Stryker vendor in her hotel room." *Cf. Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886–87 (7th Cir. 2001). These facts do not demonstrate pretext nor do they create a genuine dispute of material fact. Rather, the parties' testimony, which demonstrates "that both Thompson and Ferschweiler honestly believed that termination based on" conduct that Donley "admitted to have engaged in," along with Donley's termination letter, which "stated in part that the decision to terminate Donley's employment was made as a result of her inappropriate conduct and" poor judgment, supports the conclusion that Stryker terminated Donley because she took photos of an intoxicated CEO at a work event, staking the CEO's reputation and that of the company.

Lastly, Donley emphasizes that the polices under which Stryker terminated her employment "allowed for lesser discipline," which leads Stryker to conclude that "Donley's argument is about whether the admitted conduct rose to the level of being terminable, rather than about the honesty of Stryker's explanation for her termination, and thereby misses the point of the pretext inquiry." We agree. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 737 (7th Cir. 2008) ("[T]o show pretext, [Donley] need[s] to show not just that [Stryker] exercised poor judgment, but that it acted in bad faith, i.e., dishonestly, when it . . . fired her."). First, "Title VII does not prohibit employers

from making [adverse] employment decisions based on that which an employee considers to be a *de minimis* infraction." *Garrison v. Westat, Inc.*, No. 01 C 2918, 2002 WL 335452, at *4 (N.D. Ill. Mar. 1, 2002). Second, "courts do not sit as superior personnel departments, second-guessing an employer's facially legitimate decisions." *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003).

"Firing an employee for taking photos of the CEO of a valued business partner while [she] is intoxicated in a hotel room is a legitimate reason to terminate someone's employment." *See Flores v. Preferred Technical Grp.*, 182 F.3d 512, 516 (7th Cir. 1999) ("[T]he more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held."). Stryker met its initial burden "of showing that no genuine issue of material fact exists." *Kellogg*, 2015 WL 3930351, at *3. As the nonmoving party, Donley failed to demonstrate "that a triable issue of fact remains." *See id.* Donley has not "produced enough evidence to permit a reasonable jury to conclude that she suffered an adverse employment action because of her protected activity." *See Griffin v. Chi. Hous. Auth.*, No. 14 C 2481, 2016 WL 6091390, at *5 n.9 (N.D. Ill. Oct. 19, 2016). The Court should not abandon its good sense and sound judgment, and in this case, "[c]ommon sense suggests" that Donley's actions in Vail, rather than her internal complaint, "triggered the termination." *See Argyropoulos*, 539 F.3d at 736; *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001).

## CONCLUSION

For the foregoing reasons, the Court grants Stryker's Motion for Summary Judgment; dismisses Donley's claims; terminates this action; and will enter judgment in favor of Defendants. It is so ordered.

Dated: 1/6 /2017

_____
Charles P. Kocoras
United States District Judge